**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JONATHAN DAYTON BELK,                    )
                                          )
                    Plaintiff,            )
                                          )
                                          )
                                          )
            v.                            )    1:10CV724
                                          )
                                          )
                                          )
LEWIS O. SMITH and LARRY JONES,          )
                                          )
                    Defendants.           )
_____    )

FILED
SEP 2 7 2013
IN THIS OFFICE
Clerk U.S. District Court
Greensboro, NC
By ___

## MEMORANDUM ORDER

Plaintiff Jonathan Belk brings this pro se action against Defendants Lewis Smith and Larry Jones pursuant to 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act of 1973. Mr. Smith moves to dismiss all claims against him for failing to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) [Doc. # 15]. The Court sua sponte considers matters affecting jurisdiction and the sufficiency of Mr. Belk's allegations as they relate to Dr. Jones under 28 U.S.C. § 1915A.[1]

The Defendants are considered to have been sued in both their official and individual capacities. All claims for injunctive relief are dismissed as moot. All

_____

[1] Dr. Jones includes numerous defenses in his Answer, the fourth of which is "failure to state a claim upon which relief can be granted." Doc. # 22 at 4 (citing Fed. R. Civ. P. 12(b)(1) and 12(b)(6)). Dr. Jones did not make a separate filing moving to dismiss the claims brought against him, as required by Local Rule 7.3.

claims under the Eighth Amendment and all individual capacity statutory claims are dismissed for a failure to state a claim. All official capacity ADA claims unrelated to actual constitutional violations are dismissed as barred by sovereign immunity.

Parties are given 45 days to make additional filings as to the sufficiency of Mr. Belk's claims under the Fourteenth Amendment for irrational disability discrimination and denial of procedural due process. Mr. Belk's official capacity claims under the Rehabilitation Act may proceed. Mr. Belk's official capacity claims under the ADA may proceed to the extent that they arise from adequately pled constitutional violations.

I.

The facts alleged in the complaint are assumed to be true for the purposes of this motion. Mr. Belk, an individual with a prosthetic leg, filed this suit while an inmate in the custody of the North Carolina Department of Corrections. On or about April 8, 2010, Mr. Belk was transferred to the Albemarle Correctional Institution ("ACI") near Badin, NC. Around this time, Defendant Larry Jones, M.D. performed a brief, three minute examination of Mr. Belk, which included one question: "can you stand for a hour." Doc. # 2 at 3. Mr. Belk then had restrictions placed on him "such as no standing for no more than a hour, no going up steps, can't pick no more than 10 lbs up." Doc. # 2 at 3. Mr. Belk claims that these were "bogus restrictions" that were placed on him because of his prosthetic leg, see Doc. # 2 at 2, that they had the purpose of making him "have to max out

-2-

[his] sentence," Doc. # 2 at 3, and that they were imposed "without giving a complete examination," id.

Mr. Belk learned of these restrictions when he "put in for numerous jobs such as dorm janitor, kitchen, clotheshouse and labor pool." Doc. # 2 at 3. Performing these jobs would have reduced his prison term. Mr. Smith, however, did not permit Mr. Belk to perform these jobs because of the restrictions placed on him by Dr. Jones. Mr. Belk alleges that he was in fact capable of performing the jobs for which he applied, and that he had performed similar jobs during multiple prior periods of incarceration despite having the same handicap. See Doc. # 2 at 3.

Mr. Belk seeks an injunction restoring his ability to work and requiring Mr. Smith to "create jobs or alternative ways for person's with physical disabilities or Restrictions ways to work their sentences down to the min. like persons without disabilities." Doc. # 2 at 4. He also seeks punitive damages and $500,000 in compensatory damages. Id.

II.

Mr. Belk's complaint does not specify whether the Defendants are sued in their official or individual capacities. A pro se plaintiff bringing a claim pursuant to Section 1983 need "not plead expressly the capacity in which he is suing a defendant[.]" Biggs v. Meadows, 66 F.3d 56, 60 (4th Cir.1995). When not specified, courts determine the capacity in which a defendant is sued by examining

-3-

"the nature of the plaintiff's claims, the relief sought, and the course of proceedings[.]" Id. at 61. Mr. Belk's complaint indicates that he sued Mr. Smith and Dr. Jones in both their official and individual capacities.

As to the nature of Mr. Belk's claims, he alleges that "Lewis O. Smith and his staff" violated his rights, Doc. # 1 at 3 (emphasis added), indicating that his complaint was not solely directed at Mr. Smith as an individual, but also at the broader system he managed. As to the nature of the relief sought, Mr. Belk requests injunctive relief for himself and for all "person's with physical disabilities or restrictions," id. at 4, and though he does not specifically name a state agency as a defendant, he twice requests that the court "enter judgment declaring [that] the acts of defendants Lewis O. Smith, Larry Jones, and N.C. [D]ept. of [C]orrections" violated various constitutional provisions, id. (emphasis added). As to the course of the proceedings, although Mr. Smith asserted no defense suggesting that he considered himself to have been sued in his official capacity, Dr. Jones did include in his Answer the assertion that he "is shielded by the Eleventh Amendment and sovereign immunity from suit in his official capacity[.]" Doc. # 22, at 5. Viewed together, Mr. Belk's complaint and the course of the proceedings demonstrate that Mr. Belk intended to proceed against the Defendants in their official capacities.

The face of Mr. Belk's complaint demonstrates that Dr. Jones is also sued in his individual capacity. As to the nature of the claims, Mr. Belk alleges that Dr.

-4-

Jones "has shown deliberate indifference by putting or placing false restrictions on plaintiff without giving a complete examination: 3 minutes and asking one question can you stand for a hour isn't a complete examination or physical[.]" Doc. # 2 at 3. This allegation focuses on Dr. Jones's personal action towards Mr. Belk, and does not "necessarily implicate an official policy or custom." Biggs, 66 F.3d at 61. As to the nature of the damages sought, Mr. Belk seeks punitive damages—a form of relief only available in individual capacity suits. As to the course of the proceedings, Dr. Jones included in his Answer the defense of qualified immunity—a a defense only applicable to individual capacity claims. Mr. Belk's suit is therefore construed as being against Dr. Jones in both his individual and official capacity.

The question of whether Mr. Smith is sued in his individual capacity is a closer call. However, although the allegations against Mr. Smith generally appear to relate to the system he managed, they do include one allegation not necessarily implicating an official policy or custom. See Doc. # 2, at 3 ("Lewis O. Smith, has shown deliberate indifference for failing to provide pla[i]ntiff with an alternative Resolution[.]"). Further, Mr. Belk's request for punitive damages again indicates he intended to sue the Defendants in their individual capacities. Finally, as to the course of the proceedings, Mr. Smith extensively addressed defenses such as qualified immunity that only apply to individual capacity suits. See Doc. # 16. These factors together indicate that Mr. Smith is sued in both his individual and official capacities, and Mr. Belk's suit is construed accordingly.

-5-

III.

Mr. Belk's claims for injunctive relief must be dismissed as moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983). "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009). Mr. Belk was released on February 12, 2012. See Doc. # 16, ex. 1 at 1; Doc. # 5. As such, he no longer has a legally cognizable interest in the outcome of his request for injunctive relief. This court therefore lacks jurisdiction over those claims, and they must be dismissed.

IV.

Some of Mr. Belk's remaining claims must be dismissed for a failure to state a claim. Although only Mr. Smith filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts are nevertheless to dismiss sua sponte those portions of a prisoner's complaint that fail to state a claim upon which relief may be granted. See 28 U.S.C. § 1915A.

In order to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

-6-

plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (plaintiff must articulate facts that "show a plausibility of entitlement to relief" (quotation marks and citations omitted)). A plaintiff must therefore plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Accordingly, while a plaintiff need not plead facts that constitute a prima facie case, his "[f]actual allegations must be enough to raise a right to relief above the speculative level." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (quoting Twombly, 550 U.S. at 555).

In evaluating the sufficiency of a complaint, courts are to "construe the factual allegations in the light most favorable to plaintiff." Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) (quotation marks and citation omitted). Moreover, "liberal construction of the pleadings is particularly appropriate where, as here, there is a pro se complaint raising civil rights issues." Id. "Principles requiring generous construction of pro se complaints are not, however, without limits[,]" and do not require courts "to conjure up questions never squarely presented to them." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985).

A.

Mr. Belk claims that he was denied his rights under the Eighth and Fourteenth Amendments. Section 1983 "imposes liability on anyone who, under

-7-

color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" Blessing v. Freestone, 520 U.S. 329, 340 (1997) (quoting 42 U.S.C. § 1983). "Section 1983 itself creates no rights; rather it provides 'a method for vindicating federal rights elsewhere conferred.'" Kendall v. City of Chesapeake, Va., 174 F.3d 437, 440 (4th Cir. 1999) (quoting Albright v. Oliver, 510 U.S. 266, 271 (1994)).

Nothing in Mr. Belk's complaint suggests that his Eighth Amendment rights were violated. These claims must be dismissed in their entirety.

Mr. Belk also alleges that the Defendants violated his rights under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause. These two provisions certainly appear relevant to his dispute. Although nothing in the Constitution creates a freestanding right of access to good-time credit schemes in prison, when a state creates such a right the Fourteenth Amendment's Due Process Clause requires those minimum procedures appropriate to ensure that the state-created right is not arbitrarily denied. See Wolff v. McDonnell, 418 U.S. 539 (1974). Further, although individuals with disabilities do not constitute a protected class under the Fourteenth Amendment's Equal Protection Clause, that clause nevertheless prohibits the states from arbitrarily discriminating against those with disabilities. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). While there are doubts as to the sufficiency of Mr. Belk's claims under either aspect of the Fourteenth Amendment, neither party has briefed these

-8-

issues.[2] Out of an abundance of caution the parties are given 45 days to address the sufficiency of these two claims.

B.

Mr. Belk also claims that he was denied his rights under Title II of the ADA and Section 504 of the Rehabilitation Act. Title II applies to state prisons, see Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998), and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in . . . any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Because the language of Section 504 of the Rehabilitation Act and Title II of the ADA "is substantially the same," courts "apply the same analysis to both." Doe v. Univ. of Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995).

---

[2] In his supporting brief, Mr. Smith focuses his motion to dismiss on Mr. Belk's failure to adequately plead facts supporting supervisory liability. The Court agrees: the allegations do not plausibly support a finding of supervisory liability. However, Mr. Belk's complaint is read as alleging that Mr. Smith himself affirmatively "fail[ed] to provide Plaintiff with an alternative resolution[.]" Doc. # 2, at 3. Mr. Smith did not address whether or not this allegation, together with the rest of the complaint, sufficiently states a claim under either aspect of the Fourteenth Amendment.

Mr. Belk's pro se complaint alleges facts which, if true, could plausibly support a finding that he is a "qualified individual with a disability" who was excluded from participation in a prison jobs program because of his disability. A person with a disability is considered "qualified" if he or she, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); see also 29 U.S.C. § 705(20)(B). Mr. Belk alleges that he was not permitted to perform prison jobs that would have reduced his prison term because of restrictions related to his prosthetic leg. He alleges that he was capable of performing these jobs, as evidenced by his having performed similar jobs when previously incarcerated. Construed liberally, these facts could plausibly support a finding that Mr. Belk, with or without reasonable modification, met the essential eligibility requirements for holding a prison job. It is therefore plausible that ACI violated the ADA and the Rehabilitation Act by refusing to permit him to hold such a job because of his disability. Mr. Belk's complaint therefore states a claim for damages against the Defendants in their official capacities under both statutes.

However, neither Title II of the ADA nor Section 504 of the Rehabilitation Act permit recovery against defendants sued in their individual capacity. See

Lucas v. Henrico County Sch. Bd., 822 F.Supp.2d 589, 613 (E.D. Va. 2011);
Bracey v. Buchanan, 55 F.Supp.2d 416, 419-20 (E.D. Va. 1999). Mr. Belk's
individual capacity statutory claims must be dismissed.

V.

Although Mr. Belk's allegations state official capacity claims under Title II of
the ADA and Section 504 of the Rehabilitation Act, the availability of money
damages from the state for any such violation depends on complex issues of
Eleventh Amendment sovereign immunity. States' sovereign immunity prohibits
suits for damages "in federal court against an unconsenting state and any
governmental units that are arms of the state unless Congress has abrogated the
immunity." Coleman, 626 F.3d at 191 (citation omitted). As such, Mr. Belk's
official capacity claims can only proceed if North Carolina has consented to suit, or
if Congress has abrogated North Carolina's sovereign immunity.[3]

A.

North Carolina has not waived sovereign immunity as to Mr. Belk's ADA
claim. That claim can therefore proceed only if the ADA abrogates sovereign
immunity. To abrogate sovereign immunity, "Congress must unequivocally declare

---

[3] Although federal courts are not required to raise Eleventh Amendment
issues sua sponte, the Fourth Circuit has stated, in dicta, that "'because of its
jurisdictional nature, a court ought to consider the issue of Eleventh Amendment
immunity at any time, even sua sponte.'" Constantine v. Rectors & Visitors of
George Mason Univ., 411 F.3d 474, 481 (4th Cir. 2005) (quoting Suarez Corp.
Indus. v. McGraw, 125 F.3d 222, 227 (4th Cir.1997)).

-11-

its intent to abrogate and must act pursuant to a valid exercise of its power." Coleman, 626 F.3d at 191 (4th Cir. 2010) (citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996)). Title II of the ADA unequivocally expresses Congress's intent to abrogate sovereign immunity. See 42 U.S.C. § 12202; United States v. Georgia, 546 U.S. 151, 154 (2006). As such, the only question is whether that abrogation was enacted pursuant to a valid exercise of Congressional power.

In discussing the ADA's abrogation of sovereign immunity, the Supreme Court recognized that "the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 364 (2001). Section 5 of the Fourteenth Amendment authorizes Congress to abrogate sovereign immunity in two situations: first, as to "cause[s] of action for damages against the States for conduct that actually violates the Fourteenth Amendment," Georgia, 546 U.S. at 159; and second, as to "so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct," Tennessee v. Lane, 541 U.S. 509, 518 (2004) (quotation marks and citation omitted). As discussed above, the Court declines to address at this time the extent to which Mr. Belk's complaint states a direct constitutional claim. Mr. Belk's claim under the ADA will survive to the extent that it arises from any such violation. Regardless, to the extent that Mr. Belk's claims arise from facially constitutional but statutorily proscribed conduct, it is necessary to address the

-12-

validity of the ADA's abrogation of sovereign immunity as it relates to such claims.

In determining if a purported abrogation of sovereign immunity is a valid exercise of Congress's prophylactic enforcement powers under Section 5 of the Fourteenth Amendment, the Court applies the City of Boerne congruence and proportionality test. See City of Boerne v. P.F. Flores, 521 U.S. 507 (1997). That test proceeds in three steps:

> (1) to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II; (2) to determine whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination; and, (3) to determine whether the rights and remedies created by Title II are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress.

Chase v. Baskerville, 508 F.Supp.2d 492, 499 (E.D. Va. 2007) aff'd on other grounds, 305 F. App'x 135 (4th Cir. 2008) (quotation marks and citations omitted). Each of these steps is addressed in turn.

1.

The City of Boerne test first requires a court to "identify with some precision the scope of the constitutional right at issue." Garrett, 531 U.S. at 365. Mr. Belk contends that because he was disabled, he was not allowed to perform jobs within the prison which would have reduced his prison term. This claim implicates Title II's attempt to enforce the Fourteenth Amendment's prohibition on irrational

-13-

disability discrimination.[4]

2.

Determining whether a statute was enacted in response to a pattern of

unconstitutional disability discrimination requires "reference to the historical

experience which it reflects." Lane, 541 U.S. at 523 (quotation marks and

citation omitted). The Fourth Circuit interprets Lane as conclusively establishing

"that Title II was enacted in response to a pattern of unconstitutional disability

discrimination by States and nonstate government entities with respect to the

provision of public services." Constantine, 411 F.3d at 487. As such, further

"historical inquiry into the harms sought to be addressed by Title II" is not

---

[4] It is true that Title II implicates a "constellation of rights applicable in the prison context," Georgia, 546 U.S. at 162 (Stevens, J. concurring). One can easily imagine Title II suits enforcing many of these rights—a Title II suit addressing a prisoner's conditions of confinement might seek to enforce the Eighth Amendment; a Title II suit addressing a prisoner's access to religious facilities might seek to enforce the First Amendment. However, Mr. Belk's suit does not appear to prophylactically enforce any constitutional right other than those contained in the Equal Protection Clause. Indeed, even though Mr. Belk may state a claim for denial of procedural due process, his allegations do not raise the reasonable inference that the process he received was any way affected by his disability. As such, the Court determines that the only right being prophylactically enforced by Title II in this context is the right to be free from irrational disability discrimination. See Hale v. King, 624 F.3d 178, 184 n.7 (5th Cir. 2010) opinion withdrawn and superseded on reh'g, 642 F.3d 492 (5th Cir. 2011) (identifying the Equal Protection Clause's prohibition of irrational disability discrimination as the only right at issue in a suit brought by disabled inmates who were denied access to prison education and work programs); but see Chase, 508 F.Supp.2d at 500-505 (in a similar factual context, considering Title II in relation to prisoners' rights not only under the Fourteenth Amendment, but also under the First and Eighth Amendments).

necessary.[5] Id.

3.

Under the third step, courts must determine if an abrogation of sovereign immunity is a congruent and proportional response to the rights it purports to protect and the record of historical experience it reflects. "The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." City of Boerne, 521 U.S. at 530 (citations omitted). The Supreme Court has twice addressed the congruence and proportionality of the ADA's abrogation of sovereign immunity as to facially constitutional conduct.

In Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), the Supreme Court held that Title I of the ADA's prohibition on disability discrimination in public employment was not a valid exercise of Congress's Section 5 power to enforce the Fourteenth Amendment's prohibition on irrational disability discrimination. Garrett turned primarily on Congress's failure to identify a history and pattern of unconstitutional employment discrimination by the States against

---

[5] To the extent that additional exploration of the historical record is helpful in determining the congruence and proportionality of Title II's abrogation for the class of plaintiffs at issue, the Court recognizes significant evidence that the pattern of disability discrimination identified by Congress extended to irrational disability discrimination in prison systems. See Georgia, 546 U.S. at 161 (recognizing that "the history of mistreatment leading to Congress' decision to extend Title II's protections to prison inmates was not limited to violations of the Eighth Amendment," and listing relevant congressional findings) (Stevens, J., concurring).

-15-

the disabled.

In Tennessee v. Lane, 541 U.S. 509 (2004), the Supreme Court found that, insofar as Title II "applies to the class of cases implicating the fundamental right of access to the courts," it constituted a valid exercise of Congress's Section 5 authority to enforce the guarantees of the Fourteenth Amendment. The Court stressed that the constitutionality of Title II's abrogation should not be considered "as an undifferentiated whole," but instead with special regard to the specific class of case at issue. The Court explicitly did not consider "the class of cases that implicate only Cleburne's prohibition on irrational discrimination." Id. at 533 n.20.

The Fourth Circuit addressed this class of cases in Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005), in which a student brought suit against her public law school under Title II of the ADA. Unlike Lane, the Constantine plaintiff's suit did not implicate any constitutional right associated with heightened judicial scrutiny. In holding that Title II's abrogation was nevertheless valid, Constantine stressed the limitations Congress included in Title II, including its applying only to "qualified individuals with disabilities;" only requiring states to make "reasonable modifications to accommodate disabled citizens;" only requiring states to operate programs which "when viewed in their entirety, are accessible to and usable by disabled citizens;" and, importantly, its ensuring that States "retain the right not to take any action that they can demonstrate would result in a fundamental alteration in the nature of a service,

-16-

program, or activity or in undue financial and administrative burdens." Id. at 489-90 (quotation marks, citations, and alterations omitted). Constantine distinguished the Supreme Court's ruling in Garrett by noting both that "the remedial measures described in Title I are aimed at discrimination by public entities acting as employers, not as sovereigns," and also that "the remedial measures employed in Title II are likely less burdensome to the States than those employed in Title I." Id.

The Fourth Circuit stressed that Constantine's holding would "only . . . apply to the class of cases implicating the right to be free from irrational disability discrimination in public higher education." Id. at 488. The question at hand is therefore whether Constantine's reasoning extends to Title II suits implicating the right to be free from irrational disability discrimination in state prisons.

Constantine does not discuss how the higher education context actually informed its analysis; on its face, the Court's reasoning appears applicable to all situations in which a state, acting as sovereign, engages in conduct which could implicate an individual's right to be free from irrational disability discrimination. Be that as it may, there are profound differences between a state acting as a sovereign educator and a state acting as a sovereign incarcerator. Although public education is not a fundamental right, San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973), neither is it "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation," Plyler v. Doe, 457 U.S. 202, 221 (1982). The Supreme Court has "repeatedly acknowledged the

-17-

overriding importance of preparing students for work and citizenship, describing

education as pivotal to sustaining our political and cultural heritage with a

fundamental role in maintaining the fabric of society." Grutter v. Bollinger, 539

U.S. 306, 331 (2003) (quotation marks and citation omitted). This special role has

at times resulted in courts exercising greater scrutiny as to the constitutionality of

classifications which might otherwise simply receive traditional rational basis

review. See, e.g., Plyler, 457 U.S. at 223 (finding that the exclusion of

undocumented aliens from public primary schools "can hardly be considered

rational unless it furthers some substantial goal of the States").

In contrast, it is well accepted that States can often limit the constitutional

rights of incarcerated individuals with significantly less justification than would be

required in other contexts. See, e.g., Turner v. Safley, 482 U.S. 78, 89 (1987)

(finding that a prison's restriction of an incarcerated individual's fundamental right

to marry "is valid if it is reasonably related to legitimate penological interests"). It

is also well recognized that our federal system affords states a greater interest in

managing the details of prison administration free from federal intervention than it

does many other state functions. See, e.g., Woodford v. Ngo, 548 U.S. 81, 94

(2006) ("[I]t is 'difficult to imagine an activity in which a State has a stronger

interest, or one that is more intricately bound up with state laws, regulations, and

procedures, than the administration of its prisons.'" (quoting Preiser v. Rodriguez,

411 U.S. 475, 491-92 (1973))). As such, "[w]here a state penal system is

-18-

involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Turner, 482 U.S. at 85; see also Torcasio v. Murray, 57 F.3d 1340, 1346 (4th Cir.1995) (Recognizing that "principles of comity and federalism apply with special force in the context of correctional facilities").

Permitting Title II to abrogate state sovereign immunity as to prisoners seeking only prophylactic enforcement of their right to be free from irrational disability discrimination would impose a significantly greater cost to federalism than permitting a similar suit in the context of higher education. It would convert "[s]ervices that had been offered purely as a matter of grace" into "vehicles for liability," Chase, 508 F.Supp.2d at 506, and it would do so in the context of a system in which states have significantly more leeway in restricting individuals' constitutional rights. It is certainly true that the rights created by Title II are limited in many important ways. However, in this context, enforcing those rights through an abrogation of state sovereign immunity is not a congruent and proportional response to the history of unconstitutional behavior identified by Congress.

Congress has not validly abrogated the states' sovereign immunity as to the class of Title II suits prophylactically enforcing state inmates' right to be free from irrational disability discrimination. As such, Mr. Belk's official capacity suit under Title II of the ADA must be dismissed as barred by sovereign immunity, except to

-19-

the extent that it arises from an actual constitutional violation.[6]

B.

Unlike the ADA, Section 504 "invokes Congress's power under the Spending Clause to place conditions on the grant of federal funds." Constantine, 411 F.3d at 492 (quotation marks and citations omitted). A governmental entity therefore voluntarily waives sovereign immunity under Section 504 when it accepts federal funding. See id. at 490-96; Chase, 508 F.Supp.2d at 507.

As noted above, Mr. Belk has pled facts which, if true, could plausibly support a claim for a violation of Section 504. Although Mr. Belk has not alleged that the North Carolina Department of Corrections receives federal financial assistance, the Supreme Court has recognized that "every state . . . accepts federal funding for its prisons." Cutter v. Wilkinson, 544 U.S. 709, 716 n.4 (2005). North Carolina waived its sovereign immunity as to suits under Section 504 of the Rehabilitation Act when it accepted that federal funding. Since Mr. Belk has otherwise stated a claim for relief under the Rehabilitation Act, his official capacity claim for damages must be allowed to proceed. Since Section 504 of the

---

[6] Of the few opinions directly addressing this question, most, if not all, have reached the same conclusion. See Cochran v. Pinchak, 401 F.3d 184, 190 (3rd Cir. 2005) reh'g granted, judgment vacated, 412 F.3d 500 (3rd Cir. 2005); Hale v. King, 624 F.3d 178, 185 (5th Cir. 2010) opinion withdrawn and superseded on reh'g, 642 F.3d 492 (5th Cir. 2011); Chase, 508 F.Supp.2d at 506 (construing a comparable suit as implicating the First, Eighth, and Fourteenth Amendments); but see Cochran, 401 F.3d at 194-199 (Scirica, C.J., dissenting).

-20-

Rehabilitation Act does not permit punitive damages, see Barnes v. Gorman, 536 U.S. 181, 189 (2002), any recovery will be limited to compensatory damages.

VI.

Defendants are given 45 days to address the sufficiency of Mr. Belk's allegations as they relate to Fourteenth Amendment claims of irrational disability discrimination and denial of procedural due process, as to the defendants in both their official and individual capacities. Mr. Belk's official capacity claims under the Rehabilitation Act may proceed. Mr. Belk's official capacity claims under the ADA may proceed to the extent that they arise from adequately pled constitutional violations.

Mr. Smith's motion [Doc. #15] is GRANTED to the extent that all claims under the Eighth Amendment and all individual capacity claims under the ADA and the Rehabilitation Act are DISMISSED for a failure to state a claim. Such claims against Dr. Jones are DISMISSED sua sponte under 28 U.S.C. § 1915A(b). All claims for injunctive relief are DISMISSED as moot. All official capacity ADA claims unrelated to actual constitutional violations are DISMISSED as barred by sovereign immunity.

This, the $2 6 ^{th}$ day of September, 2013.

Senior United States District Judge

-21-